IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


M-EDGE ACCESSORIES LLC            *

          Plaintiff             *

          vs.                   *    CIVIL ACTION NO. MJG-11-3332

AMAZON.COM INC.                   *

          Defendant             *

*        *        *        *        *        *        *        *        *

MEMORANDUM AND ORDER

The Court has before it the following:

- Defendant Amazon.com, Inc.'s Motion for Summary
  Judgment ("MSJ") [Document 126];

- Plaintiff's Motion in Limine to Bar Testimony of
  Amazon's "Consumer Electronics Industry Expert," Bruce
  Koenigsberg, and to Strike His Report ("Koenigsberg
  MIL") [Document 108];

- M-Edge's Motion in Limine to Bar Certain Testimony of
  Amazon's Damage Expert, Allyn Strickland, and to
  Strike the Corresponding Portions of His Report
  [Document 117]; and

- The materials submitted relating thereto.

The Court has held a hearing and had the benefit of the

arguments of counsel.


I.   BACKGROUND

     In 2007, Defendant Amazon.com Inc. ("Amazon") launched its

Kindle Device.  Shortly thereafter, Plaintiff M-Edge Accessories

LLC ("M-Edge") began to sell Kindle accessories, including ereader covers.  The Amazon – M-Edge relationship began well but, by about 2011, began to sour, eventually deteriorating to the extent that M-Edge filed the instant lawsuit.  M-Edge asserts patent infringement and tort claims in the pending Second Amended Complaint ("SAC") [Document 33].

      A.    <u>Patent Claims (Count I)</u>

            1.    Amazon's Type I ("Shasta") Device

            2.    Amazon's Type II ("Tequila") Device

      B.    <u>Tort Claims (Count II)</u>

            3.    Unfair competition

            4.    Tortious interference

            5.    False advertising (Lanham Act)

By the instant motions, Amazon seeks summary judgment on all claims, and M-Edge seeks to exclude the testimony of two Amazon expert witnesses.

## II.   <u>STANDARD FOR SUMMARY JUDGMENT</u>

A motion for summary judgment shall be granted if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  The Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  Thus, in order to defeat a motion for summary judgment, "the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her."  Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999).

When evaluating a motion for summary judgment, the Court must bear in mind that the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

determination of every action.'" <u>Celotex</u>, 477 U.S. at 327

(quoting Rule 1 of the Federal Rules of Civil Procedure).


III. <u>DISCUSSION</u>

    A.   <u>PATENT INFRINGEMENT CLAIMS</u>

    M-Edge is the owner of Patent No. 8,047,670 ("the '670

Patent"), entitled "Booklight for a Protective Cover of an

Ereader."  As illustrated by Figures[1] 2A and 3A,



in essence,[2] the '670 Patent discloses a cover for an ereader

with a pocket slot (120) into which fits a planar base (20) so

that a light assembly housing (40) can be manipulated by a user

to illuminate a page being read.

    M-Edge asserts infringement claims against Amazon's Type I

Shasta covers and Type II Tequila covers.[3]  M-Edge asserts

---

[1] All figure references herein are to the '670 Patent.
[2] For a more complete description of the '670 Patent, see the
Memorandum and Order Re: Claim Construction [Document 95].
[3] M-Edge seems to be asserting infringement claims against
Amazon's Whitney cover as well as the Tequila cover since it
alleged that the two devices have the same material

infringement of independent claims 1, 6, and 8, the broadest of which is Claim 8, stating:

> A cover and light assembly, the cover and light assembly comprising: a protective cover including, a first and second cover each including an exterior surface and an interior surface, and an axis around which the interior surfaces of the first and second covers are bendable, and a pocket formed between the exterior surface and at least a portion of the interior surface of one of the first and second covers, the pocket not traversing the axis and having an opening formed at an edge of the interior surface; and a light including, a planar base disposed within the pocket and having a slot, a movable base with a protrusion that is received by the slot of the planar base so that the movable base is movably coupled to the planar base, a neck extending from the movable base, and a light housing disposed at a distal end of the neck.

'670 Patent, Claim 8.

1.    The Type I Shasta Cover

M-Edge accuses the Amazon Shasta cover of infringing the '670 patent.  The Shasta cover includes a light at the end of a component that slides in and out of the top right corner of the open ereader:

---

characteristics. "Both Whitney . . . and Tequila . . . involve the same structures – the same swiveling light located in the same pocket along the same place in the top edge of the back cover."  MSJ Opp. 57-58.  See id. at 54 (stating that "the Whitney or the Tequila . . . are also referred to as the Type II product"); id. at 57.



MSJ Opp. 54 [Document 143].

Amazon seeks summary judgment by virtue of the absence in the Shasta cover of:

- A "slot" in the planar base of the assembly that received a "protrusion."

- A "pocket" formed between the covers that receives the planar base of the assembly.

 a.   <u>"Slot" in the Planar Base Receiving a Protrusion</u>

Independent Claims 8, 1, and 6 of the '670 Patent require

> a planar base[4] disposed within the pocket and having a slot, [and] a movable base with a protrusion that is received by the slot of the planar base . . .

 '670 Patent, Claim 8.

M-Edge has presented expert witness testimony that, as illustrated by the following photograph, indicates there are protrusions on the movable base.

---

[4] Independent claims 1 and 6 include essentially the same limitations, with the term "substantially flat portion" used in place of "planar base."



MSJ Opp. 55.

The expert witness further opined that there is a slot that "assists the protrusions in preventing the base from coming all the way out" and "provid[es] electrical contact so the light will come on."  MSJ Ex. 38 at 242:11-14.  The witness further stated that "the slot is formed between those springs and a piece that goes on top" and "squeezes down."  Id. at 242:15-16, 243:3-4.  The following photograph shows the space between the two surfaces of a cover showing the bottom and the top of the structure the expert opines constitutes a slot.



MSJ Opp. 56.

A reasonable jury could agree with the expert witness' opinion.  Thus, the Court finds this testimony adequate to permit – but, by no means to require – a reasonable jury to find that the Shasta cover has a slot and a movable base with a protrusion that is received by the slot of the planar base.

Amazon contends that M-Edge is impermissibly amending its original infringement contentions because M-Edge's original infringement contentions made no mention of a "piece that goes on top" to form a part of either the slot or the planar base. MSJ Reply 33 [Document 149].  According to Amazon, to allow M-Edge to make this argument would be to endorse the "shifting sands" approach to infringement contentions that the Federal Circuit has rejected.  See Genentech, Inc. v. Amgen, Inc., 289 F.3d 761, 774 (Fed. Cir. 2002).  However, the Court finds no impermissible "shifting of the sands" here because it is readily

apparent, upon examining the split inside of the Shasta cover, that what M-Edge contends to be the planar base had a top that had fit on it before the cover was split.  Hence, the contention that there was a "piece on top" was implicit in the original infringement contention.

### b.    "Pocket" Between the Covers

Independent Claims 8, 1, and 6 of the '670 Patent require "a pocket formed between the exterior surface and at least a portion of the interior surface of one of the first and second covers, the pocket not traversing the axis and having an opening formed at an edge of the interior surface."  '670 Patent, Claim 8.  This Court construed the term "pocket" to mean "a receptacle in which is received the portion of the base that is referred to as the 'substantially flat portion' in Claims 1 and 6 and as the 'planar base' in Claims 8 and 17"; "formed between" to mean "located between"; and "having an opening formed at an edge of the interior surface" to mean "that the pocket opening must be formed at an edge of an interior surface – but not necessarily adjacent to the spine."  Memorandum and Order: Claim Construction 29-30 [Document 95].

The Court finds that the following photograph of the inside of a split cover of the Shasta cover shows a structure that may be found to meet the instant limitation.[5]



There is a defined area between the inside and outside of the cover into which what M-Edge contends is the planar base will fit.  That area has an opening at the edge of an interior surface.

      c.      <u>Summary Judgment Denied</u>

As discussed herein, the Court finds that there are genuine issues of material fact that prevent a grant of summary judgment

---

[5] The Court finds it unnecessary to address, for summary judgment purposes, M-Edge's additional contentions regarding the "pocket" limitation.

with regard to M-Edge's infringement claims against the Shasta
cover.

### 2.    The Type II Tequila Cover

M-Edge accuses the Amazon Type II "Tequila"[6] cover of
infringing the '670 Patent.  The Tequila cover has a rotating
arm with a light at the end that is attached at the top of the
device:



MSJ Opp. 57.

    The claims at issue include the limitations that there be

        a pocket formed between the exterior surface
        and at least a portion of the interior
        surface of one of the first and second
        covers, [and]

        a planar base disposed within the pocket . . .

'670 Patent, Claim 8.

    As discussed herein, Amazon is entitled to summary judgment
with regard to infringement claims against the Tequila cover due

---

[6] And, it seems, the Whitney cover as well.

to the absence of "a planar base disposed within or received by the pocket."[7]

M-Edge contends that the Tequila device has "a planar base disposed within the pocket" as illustrated by the following photograph.



Resp. Suppl. 8 [Document 164].

However, the evidence establishes that what M-Edge contends is a planar base (the flat piece of hard plastic in the purported pocket) is not a "substantially flat portion" of the assembly.  Rather, it is a part of the tip of a large piece of plastic that extends to both sides of the bottom of the ereader.

---

[7] The Court notes, but need not address, Amazon's apparently meritorious contention that there is an absence of evidence adequate to prevent summary judgment with regard to the existence of a "pocket" in the Tequila cover.



Suppl. Br. 5 [Document 161].





Thus, the surface identified by M-Edge as the "planar base" is but the tip of a structure that constitutes the tub for receiving the Kindle.  It is by no means a substantially flat portion of the assembly.

Accordingly, due to the absence of evidence adequate to permit a reasonable jury to find that the Tequila cover contains a planar base disposed within the pocket – if it would be determined that there was a pocket – Amazon is entitled to summary judgment with regard to the Tequila cover.


   B.   <u>Tort Claims</u>

   In addition to the patent infringement claims, M-Edge asserts tort claims against Amazon in three Counts.

   Count II –   Unfair Competition

   Count III – Intentional Interference with Contracts
               and Economic Relations

   Count IV - Lanham Act – False Advertising

   These Counts shall be addressed in turn.


   1.   <u>Unfair Competition (Count II)</u>

   "[T]he general principle" of unfair competition law is "that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." <u>Baltimore Bedding Corp. v. Moses</u>, 34 A.2d 338, 342 (1943). "The essential element of unfair competition is deception—either actual or probable deception." <u>Victor Stanley, Inc. v. Creative Pipe, Inc.</u>, CIV.A. MJG-06-2662, 2011 WL 4596043 at *8 (D. Md. Sept. 30, 2011), <u>aff'd</u>, 499 F. App'x 971 (Fed. Cir. 2013) (internal

citations omitted).  "[N]o one . . . is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort."  Baltimore Bedding, 34 A.2d at 342. To prevail on an unfair competition claim, a plaintiff must prove that the alleged misconduct "damaged or jeopardized" their business.  Berlyn Inc. v. The Gazette Newspapers, Inc., 73 F. App'x 576, 585 (4th Cir. 2003) [hereinafter Berlyn II].

This tort is broad but not boundless.[8]  Unfair competition law exists "to protect the public by healthy competition, [but] not . . . to protect individual plaintiffs."  Grempler v. Multiple Listing Bureau of Harford Cnty., Inc., 266 A.2d 1, 7 (1970).  This means that "mere competition by a business rival is not a tortious act."  Id. at 4.  This Court has held that a claim of collusion "to build up advertising revenues for [plaintiff newspaper], only later to steal that business away and to assign it to [defendant newspaper]" did not constitute a claim of unfair competition.  Berlyn Inc. v. Gazette Newspapers, Inc., 223 F. Supp. 2d 718, 738 (D. Md. 2002) [hereinafter Berlyn I], aff'd sub nom. Berlyn II.  This was because plaintiffs

---

[8] S. Volkswagen, Inc. v. Centrix Fin., LLC, 357 F. Supp. 2d 837, 852 (D. Md. 2005) ("[T]his Court has consistently delineated the parameters of this tort in a very broad manner.")  See also Baltimore Bedding, 34 A.2d at 342 ("Each case is a law unto itself" and "[w]hat constitutes unfair competition in a given case is governed by its own particular facts and circumstances.").

"failed to show that the defendants' actions in this case were anticompetitive, or that each complained-of action was not taken with some independent and legitimate business purpose."  Id. at 739.

M-Edge bases its unfair competition claims on seven "categories of conduct," each of which, it alleges, independently supports a claim of unfair competition:

1)   Amazon's creation and use of the MfK program.

2)   Amazon's effort to instruct and assist Marware.

3)   Amazon's use of confidential information products.

4)   Amazon's use of unlawful pricing strategies to harm M-Edge.

5)   Amazon's use of search path strategies to harm M-Edge.

6)   Amazon's use of threats.

7)   Amazon's use of deceit.

MSJ Opp. 34-44.

These shall be addressed in turn.


1) The Made for Kindle Program

In 2009, M-Edge became a member of the "Kindle Compatible Vendor" program, which, among other things, allowed M-Edge to label its products as "Kindle Compatible" and sell them online through Amazon.com.  MSJ 4.  By the end of that year, "M-Edge

was Amazon's largest third-party Kindle accessories seller."
MSJ Opp. 5.

Amazon found that it had under-estimated the market for
Kindle accessories.  Hr'g Tr. 130:13-14 [Document 160].  As a
way to increase its margin on sales by third-party vendors such
as M-Edge, Amazon initiated the "Made for Kindle" (MfK) program
in the early part of 2011.  Under this program, Amazon-selected
members whose products met Amazon's standard for quality would
be given special benefits.  These benefits included being sold
in the Kindle Store area of Amazon.com, permission to use the
"Made for Kindle" trademark, pre-launch access to new Kindle
products, and inclusion on Amazon's list of "Made for Kindle"
vendors.  Id. at 5-6.  MfK members, in return, would pay Amazon
a royalty on their sales of Kindle-related products.

M-Edge rejected Amazon's offer to take part in the MfK
program.  Id. at 7.  This decision was at least partially
motivated by what M-Edge considered to be the high royalty rates
that it would have to pay on sales of its Kindle-related
products.  Id. at 7-9.

M-Edge has failed to produce evidence adequate to permit a
reasonable jury to find that the MfK program constituted
actionable unfair competition on the part of Amazon.  M-Edge
indisputably was given the opportunity to participate in the

17

invitation-only program and made an informed business decision not to participate.  Id. at 7-8.  Any "harm" sustained by non-participation in the MfK program was caused by M-Edge's decision that the benefit of participating would be outweighed by the cost.

Moreover, the evidence establishes the existence of valid business reasons for the MfK program – having nothing to do with any unfair competition vis-à-vis M-Edge.  See Berlyn I, 223 F. Supp. 2d at 739 (holding that non-anticompetitive activity performed for a legitimate business purpose did not constitute unfair competition).  Certainly, Amazon was justified in seeking to promote the quality of merchandise that would be used together with its Kindle ereaders.  Nor was there anything even arguably wrong with Amazon's charging a royalty to manufacturers who benefitted from the use of Amazon's "endorsement."


## 2) Amazon's Assistance of Marware

Marware, an M-Edge competitor, is a participant in the MfK program.  Amazon assisted Marware to sell its Kindle-related products, some of which were competitive with M-Edge products. As Amazon acknowledges, Marware was "a very small player and a largely unknown brand until we put muscle behind them."  MSJ Opp. Ex. 33.

18

Amazon's assistance involved helping Marware and encouraging Marware to adopt features of other successful products, including M-Edge ereader accessories.  MSJ Opp. 34-36. There is no evidence that Amazon's actions were improper.  For example, there is no evidence that would establish that any copied features of M-Edge products were legally protected. Amazon's assistance of Marware – so as to generate Marware sales on which royalties would be paid Amazon – did not constitute unfair competition.  Of course, Amazon can be viewed as, in effect, acting as a competitor of M-Edge in regard to Marware's sales.  However, "mere competition by a business rival is not a tortious act."  Grempler, 266 A.2d at 4.

### 3) Amazon's Use of Confidential Information

There is evidence that Amazon used information that it had regarding M-Edge sales to design its own Kindle accessories. MSJ Opp. 1.  Specifically, Amazon copied M-Edge's best-selling colors, id. at 8, and gave M-Edge's sales information to Marware, id. at 16-17.  M-Edge contends that the sales data was confidential, and Amazon's use constituted unfair competition. The sales information in question was, however, not M-Edge's internal data but Amazon's records of its own sales of M-Edge products.  Hr'g Tr. 84-85.  The information was not

"confidential" information over which M-Edge had any exclusive rights vis-à-vis Amazon.  M-Edge's former Vice President of Sales corroborated this concept: "[M]y assessment is that we were a partner with them, so they had the [sales] data.  They didn't steal it from anywhere."  MSJ Opp. Ex. 25 at 334.

M-Edge alleges that Amazon used confidential M-Edge prototypes to launch its own products.  MSJ 8.  The only "evidence" is a general declaration of M-Edge's chief technology officer.  MSJ Ex. 16 at ¶ 2.  M-Edge never states what prototypes were submitted to Amazon or what features, other than color, were copied.  The evidence is insufficient to present a viable unfair competition claim.

M-Edge presented evidence that a former Best Buy executive gave Amazon the offline margin that M-Edge and two other vendors had with Best Buy.  MSJ Opp. 29-30 (quoting Exs. 83-84).

An offline margin is used "to understand what other vendors pay to offline retailers."  MSJ Opp. Ex. 56 at 129.  If a vendor, for example, sells a $100 product with a 68% margin, the wholesale cost is $32 and the profit is $68.  Id. at 126.  M-Edge argues that possession of this information constitutes a misuse of confidential information.  MSJ Opp. 29-30.  During deposition, an Amazon employee claimed that this information was used as a "benchmark" to determine "if the retail margin that

the vendors are offering to Amazon as a retailer is a fair and equitable margin relative to . . . other retailers."  MSJ Opp. Ex. 56 at 129.

M-Edge presents no evidence to establish that Amazon's possession or use of the offline margins "damaged or jeopardized" their business.  See Berlyn II, 73 F. App'x at 585 ("To prove unfair competition under Maryland law, a plaintiff must show that a defendant damaged or jeopardized his or her business . . . .").

### 4) Amazon's Pricing Strategies

M-Edge contends that Amazon's use of below-cost pricing constituted unfair competition.  MSJ Opp. 40-42 (citing MD. CODE ANN., Com. Law § 11-404(a)).

M-Edge produced evidence that Amazon offered discounts and sold related products as bundles amounting to below-cost pricing.  M-Edge has not, however, presented evidence adequate to permit a reasonable jury to find that Amazon acted with the intent to harm them.  MD. CODE ANN., Com. Law § 11-404(a) requires that the seller act "with intent to injure a competitor or to destroy competition."  Id.

M-Edge has not presented evidence adequate to permit a reasonable jury to find that Amazon had any intent "to destroy

competition."  There is no evidence that Amazon lacked a
legitimate business purpose for its discounted sales.  Id.; see
also Berlyn I, 223 F. Supp. 2d at 739.  At the motions hearing,
Amazon pointed out that the specifically-referenced promotions
were undertaken to get rid of excess inventory, some of which
were related to an obsolete product. Hr'g Tr. 153-55.  Such
behavior is permissible under Maryland law, which permits below-
cost sales where "the merchandise . . . [m]ust be sold promptly
in order to prevent loss."  MD. CODE ANN., Com. Law § 11-402(8).

### 5) Amazon's Use of Search Path Strategies

M-Edge also contends that Amazon's use of search path
strategies provides a basis for an unfair competition claim.  It
proffers two items of evidence in support of this contention.

One such item is a non-authenticated printout of an
internet page.  MSJ Opp. Ex. 86.  This is purported to be a
printout of search results for the term "M-Edge" on the Wall
Street Journal's website.  The first search result reads in
part:

    M Edge TM – Official Site . . . Kindle.Amazon.com
    Buy Kindle or Kindle DX at Amazon. . . .

M-Edge claims that the advertisement of "Amazon.com" as the
"Official Site" for M-Edge constitutes unfair competition.

First, without authentication, this printout is
inadmissible hearsay inadequate to support an opposition to
summary judgment.  Greensboro Prof'l Fire Fighters Ass'n, Local
3157 v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995).
Indeed, several courts have held that printouts of third-party
websites are inherently non-trustworthy without authentication.[9]

Authentication of such documents requires testimony of
"someone with knowledge of the accuracy of the [document's]
contents."  McReynolds v. Lowe's Cos., Inc., No. 08-CV-0335,
2008 WL 5234047, at *7 (D. Id. Dec. 12, 2008).  It is not enough
for one party to say that the printout was obtained from a
particular website.  Id.  M-Edge's internet evidence, then, is
insufficient to support an opposition to summary judgment
because the evidence has not been authenticated.

Even if the printout were authenticated, M-Edge has not
presented evidence that would establish that the alleged conduct

---

[9] St. Luke's Cataract & Laser Inst., P.A. v. Sanderson, 8:06
CV223TMSS, 2006 WL 1320242, *2 (M.D. Fla. May 12, 2006) ("Web-
sites are not self-authenticating."); In re Homestore.com Inc.,
347 F. Supp. 2d 769, 782 (C.D. Cal. 2004) ("Printouts from a web
site do not bear the indicia of reliability demanded for other
self-authenticating documents under Fed. R. Evid. 902."); St.
Clair v. Johnny's Oyster & Shrimp, Inc., 76 F. Supp. 2d 773, 775
(S.D. Tex. 1999) ("Anyone can put anything on the Internet. No
web-site is monitored for accuracy and nothing contained therein
is under oath or even subject to independent verification absent
underlying documentation.").

"damaged or jeopardized" M-Edge's business.  Berlyn II, 73 F.
App'x at 585.

M-Edge also seeks to rely upon two e-mails in which Amazon
officials discuss setting up internet search terms using the
keyword "M-Edge."  In one, Mr. Vasen (Amazon) tells several
Amazon employees to "[s]how Marware equivalent products for
specific M-Edge searches."  MSJ Opp. Ex. 87.  In another, an
Amazon employee acknowledges "creat[ing] a sparkle specifically
for M-Edge keywords that also directs to Accessories homepage."
MSJ Opp. Ex. 91.  In the context of this e-mail, a "sparkle" is
a link displayed alongside search results for an M-Edge product
that directs a user to another company's related product.
Amazon has admitted to bidding for searches based on the M-Edge
keyword.  MSJ Ex. 22 ¶¶ 2-3.  M-Edge engages in the same
practice with its competitors' keywords.  MSJ Ex. 28.

Amazon presents legal authority supporting the
permissibility of such practice.  See 1-800 Contacts, Inc. v.
Lens.com, Inc., 722 F.3d 1229 (10th Cir. 2013); Network
Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137
(9th Cir. 2011).  Therefore, this conduct cannot serve as a
basis for a claim of unfair competition.

6) Amazon's "Threats"

M-Edge seeks to characterize as "threats" statements made in the course of contract negotiations.

M-Edge entered into its first contract with Amazon in February 2009.  MSJ 4.  Difficulties began in early 2010, when the parties began to renegotiate a third-party merchant contract.  At one point, Amazon "demanded" that M-Edge pay Amazon an increased rate and retroactively pay a large amount in back fees.  MSJ Opp. 5.  An Amazon employee later admitted that he "didn't have a legal leg to stand on" in his requests.  Id. at 6.  M-Edge eventually signed a renewal of the licensing contract on July 20, 2010, reluctantly agreeing to an increased royalty payment to Amazon.  MSJ 4-5, Ex. 8.  There is no indication that M-Edge was ever required to pay the requested back fees.  M-Edge also states that Amazon submitted several new demands in December 2010 and January 2011.  MSJ Opp. 11.

M-Edge and Amazon negotiations, then, were contentious by 2011, when Amazon first approached M-Edge with an offer to be a part of the MfK Program.  When M-Edge indicated that it would not participate, an Amazon employee allegedly told M-Edge's Vice President of Sales: "That's a path you really don't want to go down, because we are going to be putting pressure on retail to use the preferred partners.  It will cause damage to you if

you're not part of the program."  MSJ Opp. 36-37 (quoting
Exhibit 25 at 40).  The M-Edge executive interpreted this as a
threat and claimed that the Amazon employee used the word
"pressure."  Id.

Amazon had a valid reason to discourage M-Edge from
rejecting the MfK program since M-Edge was a successful and
popular third-party merchant.  At one point, "M-Edge was
Amazon's largest third-party Kindle accessories seller."  MSJ
Opp. 5.  At least one Amazon executive described M-Edge as his
"favorite brand."  Id. at 25.  Another believed that M-Edge made
"great products, high quality products."  Id. at 5.  Amazon,
then, had a legitimate business purpose to try to persuade M-
Edge to be part of the MfK program. See Berlyn I, 223 F. Supp.
2d at 739.

The Court finds the evidence inadequate to permit a
reasonable jury to find that Amazon's statements in the course
of negotiations to constitute actionable "threats" or otherwise
to constitute unfair competition.[10]

---

[10] There is nothing indicating that Amazon had any intent to
undertake illegal action.  Nor, most certainly, is there any
evidence of deceit.  "[T]he essential element of unfair
competition is deception." Victor Stanley, 2011 WL 4596043 at
*8.

7) Amazon's "Deceit"

M-Edge contends that Amazon practiced deceit by not fulfilling its promise to provide M-Edge with pre-launch access to Amazon's third-generation Kindle (also called Kindle 3 or "Shasta").  MSJ Opp. 43.  However, M-Edge does not refer to any contract provision obligating Amazon to do so.  MSJ 5 n.5.

M-Edge proffers evidence that, it contends, establishes that Amazon promised to provide pre-launch access to the Kindle 3.  In a deposition of M-Edge's CFO, where after being questioned about "what value [he saw] in being part of the Kindle Store," he replied, "[t]hat we would get to be there at launch of a new device."  MSJ Opp. Ex. 9 at 162.  In a deposition, an Amazon employee admitted discussing pre-launch access with M-Edge, but never admitted that it was a part of their agreement.  MSJ Opp. Ex. 8 at 34-35.

M-Edge complains that, when Kindle 3 was released on July 28, 2010, it only received access to the device the day before.  MSJ Opp. 7-8 (quoting Ex. 13 at 28-29).  However, M-Edge had only renewed its third-party merchant contract on July 20, 2010.  MSJ Ex. 8.  Therefore, even if M-Edge acquired a contractual right to prelaunch specifications, it would have only obtained such information one week earlier than it did.  M-Edge has not

presented evidence of any injury resulting from such a one-week delay.

M-Edge presents evidence of a 2011 meeting in Seattle just prior to the launch of Kindle Fire.  M-Edge states that at this meeting, Amazon "pump[ed] M-Edge for product information" even though it had already decided "to dramatically cut M-Edge's online sales and exclude M-Edge from the launch of the Kindle Fire."  MSJ Opp. 43; see id. at 15.  But asking a competitor who has agreed to meet with you about their products is not deceit.

Absent proof of any obligation of Amazon to provide pre-launch access, there can be no deceit in its declining to do so.


2.   Tortious Interference (Count III)

1) Legal Principles

In Maryland law, to establish a claim for tortious interference, a plaintiff must prove:

1. Intentional and willful acts;
2. Calculated to cause damage to the plaintiffs in their lawful business;
3. Done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and
4. Actual damage and loss resulting.

Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc., 650 A.2d 260, 269 (Md. 1994).

Regarding the third (unlawful purpose) element, Maryland requires that a plaintiff must provide "proof that the defendant's conduct in interfering with contract or business relations was accomplished through improper means" by conduct that is "independently wrongful or unlawful." <u>Lyon v. Campbell</u>, 707 A.2d 850, 860 (Md. Ct. Spec. App. 1998) (quoting <u>Alexander</u>, 650 A.2d at 271).  Examples of such conduct include "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." <u>Spengler v. Sears, Roebuck & Co.</u>, 878 A.2d 628, 642 (Md. Ct. Spec. App. 2005) (quoting <u>K & K Mgmt., Inc. v. Lee</u>, 557 A.2d 965, 979 (Md. 1989)).  However, "improper or wrongful conduct is incapable of precise definition" and can be "quite subtle." <u>Macklin v. Robert Logan Assoc.</u>, 639 A.2d 112, 119 (Md. 1994).

To establish the fourth (causation) element, the plaintiff must provide "evidence to show that, more likely than not, the defendant's wrongful conduct caused the injury alleged." <u>Lyon</u>, 707 A.2d at 860.

M-Edge's tortious interference claim rests upon its allegations that Amazon:

- made misrepresentations about M-Edge's status as an Amazon-approved vendor; and

- performed "unlawful acts of coercion against retailers."

MSJ Opp. 47.

M-Edge has not presented evidence adequate to permit a reasonable jury to find that either of these allegations has been established.  Nor has M-Edge presented evidence to establish that the alleged Amazon actions caused it cognizable injury.[11]


### 2) Misrepresentations

M-Edge contends that Amazon used the MfK Program to make misrepresentations regarding the quality and trustworthiness of M-Edge products.  Specifically, M-Edge contends that "Amazon directed its representatives to spread false messages that only MfK vendors had 'High quality products: Amazon approved and tested,' and that only MfK vendors were 'highly capable, honest, and trusted.'"  MSJ Opp. 46 (quoting Ex. 64)(emphasis added).

---

[11] See, e.g., Med. Mut. Liab. Soc. of Maryland v. B. Dixon Evander & Associates, Inc., 660 A.2d 433 (Md. 1995) (finding inadequate evidence of causation of customer loss by derogatory statements, and stating that plaintiff presented no evidence that a customer's decision to leave [Plaintiff] Evander, Inc. was prompted by a perception that Mr. Evander was 'inadequate,' rather than by a desire to remain insured by [Defendant] Medical Mutual." Id. at 440-41.  M-Edge asserts that it lost sales to eight companies after creation of the MfK program, asserting that it lost $3,000,000 of sales to Best Buy.  MSJ Opp. 48-49. However, M-Edge presents no evidence this loss of sales was caused by any misrepresentation by Amazon.

M-Edge presents an Amazon email providing selling points to vendors.  The e-mail does not include the word "only" or otherwise state that only MfK vendors' product were of high quality, and it does not contain any misrepresentation regarding M-Edge.  MSJ Opp. Ex. 64.  Regarding "non-preferred vendors," the e-mail states: "retailers should direct them back to Amazon to join the [MfK] program."  Id.  There is no false statement about the quality or trustworthiness of M-Edge products or any instructions to its employees to make such statements.

While the instant decision is based upon the absence of evidence supporting M-Edge, the Court must note that there is ample evidence of communications indicating that Amazon did not deliberately disparage non-MfK vendors.  For example, in an e-mail to the third-party retailer HMS Host, Amazon makes five positive assertions about MfK vendors, but does not state anything regarding the quality or trustworthiness of non-MfK vendors.  MSJ Opp. Ex. 62.  In that same exhibit, another Amazon employee describes responding to an accessory buyer's question about M-Edge as follows: "I stuck to the script and focused on our partners abilities, leaving risk on M-Edge."  Id.  Amazon emphasized "our partners (sic) abilities" rather than berating non-MfK companies.

31

### 3) Coercion

M-Edge contends that Amazon committed acts of coercion that prevented other vendors from buying from M-Edge.  MSJ Opp. 47-48.  "Specifically, Amazon contacted each major retailer and stated that M-Edge is not an approved Amazon vendor, and therefore M-Edge's products should not be purchased; Amazon also warned of repercussions if its directive was not followed . . . ."  Second Am. Compl. ¶ 36.

M-Edge presents, as purported evidence of this alleged coercion, four emails from Amazon. Three of these do not even mention M-Edge.  MSJ Opp. Exs. 70, 72, and 75.  Only one of these emails refers to M-Edge[12] [MSJ Opp. Ex. 60].  M-Edge presents a truncated quote from the email in its opposition to the instant Motion for Summary Judgment:

---

[12] The email states:

> Peter, I'm headed on vacation. I support pushing the MFK program.  I also support pushing our retailers to not allow other accessory providers like M-Edge to use our Kindle brand in their advertising or packaging (e.g., referencing Kindle compatible).  I don't think we can block them from selling accessories using the generic e-reader reference, though.
>
> Have we made any progress getting a deal with M-Edge?  They are still my favorite brand, and I understand why some retailers want their product.

MSJ Opp. Ex. 60.

> Amazon's campaign against M-Edge's retail
> sales also included unlawful acts of
> coercion against retailers. Amazon had
> contracts with various retailers that
> predated MfK, and some had provisions
> relating to Kindle Compatible accessories .
> . .   These contracts did not prohibit
> buying from M-Edge, because M-Edge had been,
> and still was, an Amazon-approved Kindle
> Compatible vendor. Amazon knew this was a
> wrongful assertion of contract rights. <u>When
> asked to support the contract coercion,
> Amazon's Dave Zimmer replied: "I don't think
> we can block them [M-Edge] from selling
> accessories...</u>" (Ex. 60).

MSJ Opp. 47 (emphasis added).   However, the full final sentence

of the quote from Mr. Zimmer's statement is: "I don't think we

can block [M-Edge] from selling accessories <u>using the generic e-

reader reference</u>."   <u>Id.</u> (emphasis added).

M-Edge has not produced evidence adequate to permit a

reasonable jury to find that Amazon coerced retailers to cease

doing business with M-Edge.


        3.   <u>False Advertising (Count IV)</u>

To establish a false advertising claim under the Lanham

Act, 15 U.S.C. § 1051 <u>et. seq.</u>, a plaintiff must prove that:

1.   The defendant made a false or misleading
     description of fact or representation of fact in
     a commercial advertisement about his own or
     another's product;

2.   The misrepresentation is material, in that it is
     likely to influence the purchasing decision;

3.    The misrepresentation actually deceives or has
      the tendency to deceive a substantial segment of
      its audience;

4.    The defendant placed the false or misleading
      statement in interstate commerce; and

5.    The plaintiff has been or is likely to be injured
      as a result of the misrepresentation, either by
      direct diversion of sales or by a lessening of
      goodwill associated with its products.

Scotts Co. v. United Indus. Corp., 315 F.3d 264, 272 (4th Cir.

2002).

Evidence of actual confusion may be required to prevail on

a claim of false advertising.  "Where the advertisement is

literally false, a violation may be established without evidence

of consumer deception."  Id. at 273 (quoting Cashmere & Camel

Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir.

2002)).  For advertisements that are only impliedly false, the

"plaintiff must demonstrate, by extrinsic evidence, that the

challenged [advertisements] tend to mislead or confuse

consumers."  Scotts, 315 F.3d at 273 (quoting Johnson & Johnson

* Merck Consumer Pharm. Co. v. Smithkline Beecham Corp., 960

F.2d 294, 297 (2d Cir. 1992)).  This requires a showing that "a

substantial portion of the audience for that advertisement was

actually misled."  Scotts, 315 F.3d at 276 (quoting Clorox Co.

Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 36

(1st Cir. 2000)).

M-Edge cites three purportedly bad acts by Amazon as bases
of this claim:

1.    The use of advertisements based on third-party
      search engines that resulted in Amazon
      advertising Amazon.com as the "official site" of
      M-Edge;

2.    Statements on [Amazon.com] that M-Edge's products
      are "no longer available"; and

3.    Amazon's use of the approved vendor list in
      connection with the MfK program.

MSJ Opp. 50-53.

### 1) Third-Party Search Terms

M-Edge seeks to support its false advertising claim related
to third-party search engines by proffering the unauthenticated
printout of an internet search page, discussed and deemed
inadmissible herein with reference to its unfair competition
claim.

As discussed herein, in the context of M-Edge's unfair
competition claim, Amazon used what it referred to as "sparkles"
to direct consumers using M-Edge keywords to the Amazon
accessories page.  M-Edge contends that this practice is a false
or misleading description of fact or misrepresentation of fact.
As stated in Playboy Enters., Inc. v. Netscape Comms. Corp., 354
F.3d 1020, 1035 (9th Cir. 2004) (Berzon, J., concurring):

35

> If I went to Macy's website and did a search for a
> Calvin Klein shirt, would Macy's violate Calvin
> Klein's trademark if it responded (as does Amazon.com,
> for example) with the requested shirt and pictures of
> other shirts I might like to consider as well?  I very
> much doubt it.

See also Wells Fargo & Co. v. WhenU.com, Inc., 293 F. Supp.

2d 734 (E.D. Mich. 2003) (holding no likelihood of confusion for

pop-up advertisements for non-Wells Fargo vendors displayed in

response to "Wells Fargo" keyword); U-Haul Int'l, Inc. v.

WhenU.com, Inc., 279 F. Supp. 2d 723, 728 (E.D. Va. 2003).

Since Amazon's use of "sparkles" would not constitute a

literally false statement, M-Edge would have had to produce

extrinsic evidence of consumer confusion by virtue of their use.

Scotts, 315 F.3d at 273.  M-Edge has not done so.


## 2) Product Availability

M-Edge contends that Amazon engaged in false advertising by

referring to M-Edge products as "no longer available" on its

website.  MSJ Opp. 51.  M-Edge presents, as evidence, an e-mail

from a "Beth Weston" sent to "kindle-feedback."  MSJ Opp. Ex.

88:

> I recently purchased a Kindle keyboard
> 3G and WiFi. To be honest, I still like
> reading an actual book. However, I do like
> the convenience of being able to take my
> Kindle "book" to places where I will have
> time to read. I also like the feature that
> lets me sample books.  There was an

> advertising card for the "e-luminator
> light" when  I bought my M-Edge cover. But
> the website now says they are no longer
> available.

M-Edge acknowledges that it "may be literally true that M-Edge products are 'no longer available' on Amazon." MSJ Opp. 51.  Nevertheless, according to M-Edge, the "no longer available" falsely "convey[s] the message that the M-Edge products have been discontinued, and cannot be found elsewhere; rather than the truth which is that Amazon has simply refused to sell them." Id.

However, this email does not prove that "the defendant made a false [statement]." Scotts, 315 F.3d at 273.  Amazon was at one point under contract to sell M-Edge products on its website, but the contract had ended.  MSJ 4-5.  So the "no longer available statement" – as acknowledged by M-Edge – may be literally true.

Moreover, in the modern world, with ready availability of eBay and numerous sources for products discontinued by a manufacturer, a consumer would not reasonably conclude that a message of unavailability on Amazon.com would constitute a statement that a product was not available from any other source.  M-Edge has not shown that the alleged "misrepresentation is material, in that it is likely to

37

influence the purchasing decision." Id. at 272. Certainly, Ms.
Weston's email does not compel such a conclusion.

The "no longer available" evidence, then, fails to
establish a claim of false advertising.


### 3) Approved Vendor List

M-Edge contends that Amazon engaged in false advertising by
"approach[ing] M-Edge's existing and prospected offline retail
customers with a list of 'approved' vendors and messages about
the MfK program." MSJ Opp. 53. This behavior allegedly
constitutes false advertising because it gave the "literally
false" message that M-Edge was not an "approved" vendor. Id.
According to M-Edge, Amazon's message that M-Edge was not an
"approved" vendor was "literally false" because "[w]hen Amazon
contrived the [MfK] program, M-Edge was already an Amazon-
approved vendor of Kindle covers." Id. at 44 (emphasis added).
See also id. at 25 ("The MfK list itself was misleading because
its very existence suggested that Amazon's approval was required
for M-Edge to sell Kindle accessories.").

In stating that it was an "approved" vendor before creation
of the MfK program, M-Edge appears to refer to its status under
the "Kindle-Compatible Vendor" program, which M-Edge joined in
2009. MSJ 4. As an "approved" member of this program, M-Edge

38

was allowed to label its products as "Kindle Compatible" and
sell them online through Amazon.com.  <u>Id.</u>  Amazon admits that M-
Edge was an "approved" vendor under the earlier "Kindle-
Compatible Vendor" program:

> Q [M-Edge]:    And as of June 20, 2011, [after
>        creation of the MfK program,] M-Edge was an
>        approved Kindle compatible vendor; correct?
> A [Amazon]:    Yes.  Under our previous iteration of
>        the contract.

MSJ Opp. Ex. 56 at 104.

The fact is that Amazon's statements regarding M-Edge's
status as a non-MfK-approved vendor were not literally false.
The MfK "approved list" and the earlier "Kindle-Compatible
Vendor" programs were separate programs.  Because M-Edge was not
an MfK-approved vendor, it was not wrong for Amazon to say so.
M-Edge, therefore, fails to establish the first element of a
claim for false advertising.

Accordingly, the Court shall grant Amazon's motion for
summary judgment related to false advertising.


IV.  <u>MOTIONS IN LIMINE</u>

By the instant motions in limine, M-Edge seeks to have the
Court:

> 1.    Bar the testimony of Amazon's "consumer electronics
>        industry expert," Bruce Koenigsberg, and striking his
>        report from the record.

2.    Bar certain testimony of Amazon's damages expert, Dr. Allyn Strickland, and striking the corresponding portions of his report.

A.    <u>Legal Standard</u>

A witness may be qualified as an expert "by knowledge, skill, experience, training, or education."  <u>Id.</u>  Such a witness "may testify in the form of an opinion or otherwise if:

1.    "[T]he expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

2.    "[T]he testimony is based on sufficient facts or data;

3.    "[T]he testimony is the product of reliable principles and methods; and

4.    "[T]he expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702.

"The witness' qualifications to render an expert opinion are also liberally judged by Rule 702."  <u>Kopf v. Skyrm</u>, 993 F.2d 374, 377 (4th Cir. 1993).  The Fourth Circuit has stated that testimony based on experience is admissible if the expert can explain "how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts."  <u>United States v. Bynum</u>, 604 F.3d 161, 167 (4th Cir. 2010) (internal quotations and citations omitted).  Maryland courts have noted

that "[n]othing in Rule 702 precludes an expert witness from giving some context to his opinion" and that "[s]ome factual discussion is therefore expected in an expert report."  Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC, 858 F. Supp. 2d 505, 512 (D. Md. 2012).

The Federal Rules also allow experts to rely on otherwise inadmissible evidence.  One situation is where "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  Fed. R. Evid. 703.  If such facts or data would be otherwise inadmissible, "the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  Id.

The Supreme Court has held that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993).  From this, it follows that the proper vehicle for resolving disputed facts is cross examination, not a motion in limine.  See Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) ("As with all other admissible evidence, expert testimony is subject to being tested by '[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof.'") (quoting Daubert, 509 U.S. at 596).

### 1.   Mr. Bruce Koenigsberg (Consumer Electronics)

Amazon proffers the testimony of Mr. Keonigsberg as a Consumer Electronics Industry Expert.  M-Edge states that the "essence of Mr. Koenigsberg's opinion is that Amazon's conduct comported with "industry standards", and M-Edge's conduct was not consistent with industry "best practices." Koeningsberg MIL Mem. 1 [Document 109].

As discussed herein, the Court shall grant summary judgment to Amazon with regard to all claims other than its patent infringement claim against the Shasta cover. Accordingly, the Court is not certain of the extent to which, if at all, Mr. Koenigsberg will testify at trial.  However, the Court shall assume that he could provide relevant testimony.

M-Edge contends that the Court should bar his testimony because of:

1.   Deficient qualifications.

2.   Improper methodology relating to "standards."

3.   Improper methodology in repackaging M-Edge's claims.

4.   Improper role.

Koenigsberg MIL Mem. at 1-2.

1) Qualifications

Although Mr. Koenigsberg "describes his business as 'an independent consultant [who] works with vendors to help them launch products in to retail,'" he only has one client, who is part-time.  Koenigsberg MIL Mem. 9.  Furthermore, he admits to having no training or education relating to "common buying practices" or "industry standards" and states that he has never taught or written about this subject.  Id. at 10.

Nevertheless, Mr. Koenigsberg has 37 years of experience in the consumer electronics industry.  Koenigsberg Opp. 3 [Document 119].  In that capacity, he has represented both retailers like Amazon and product vendors like M-Edge.  Id.  Furthermore, he has "personally participated in thousands of negotiations of consumer electronics program between retailers and vendors from both [sides] and has supervised many more . . . ."  Id. at 7.

Certainly, M-Edge can debate the persuasive value of Mr. Koenigsberg's experience,[13] but he does have experience relevant

---

[13] While Mr. Koenigsberg did spend 16 years as "a buyer for one retail appliance chain," that job ended 20 years ago. Koenigsberg Reply 2 [Document 131].  His current job is a consultant "for an event business that charges vendors for space to pitch products to retailers."  Id.  Amazon did note, however, that this job involves providing notable clients such as "Best Buy, Staples, and Target" with "what terms and conditions retailers are requiring from vendors in order for vendors to have their products stocked in retailers' stores."  Koenigsberg Opp. 3.

to the consumer electronics industry.  "[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."  Wilson, 484 F.3d at 274 (quoting advisory committee's notes on Fed. R. Evid. 702).  Therefore, the Court finds Mr. Koenigsberg's qualifications adequate to permit him to serve as an expert witness on matters within the purview of his experience.

### 2) Standard Texts

M-Edge contends that Mr. Koenigsberg's opinions are "classic ipse dixit" in that he "point[s] to no texts, articles, or written standards against which his conclusions could be tested."  Koenigsberg MIL Mem. 2.  M-Edge notes that Mr. Koenigsberg did not practice any accepted methodology in determining "industry standards" or "buying practices."  Id. at 11.  Rather, his opinions were "just based on [his] experience." Id. at 12.

Mr. Koenigsberg stated that he was unaware of any "written industry standards in an article, a text, or anywhere else that [he] could consult."  Id. at 13.  Amazon contends that "[t]here are no textbooks, treatises, or written manuals" describing best practices in the consumer electronics industry.  Koenigsberg Opp. 5.  M-Edge, does not present any standard text or other

44

authority that it contends Mr. Koenigsberg should have relied on.  The Court finds, therefore, that the only "way in which [the] expert [could] gain meaningful knowledge about [the matters in question] . . . is through personal experience."  Id.

### 3) Improper Methodologies

M-Edge contends that Mr. Koenigsberg relied upon "improper methodology in repackaging M-Edge's claims."  Koenigsberg MIL Mem. 2.  Specifically, M-Edge says that Mr. Koenigsberg "impermissibly distilled M-Edge's detailed contentions about Amazon's misconduct . . . into eight sentences . . ., carefully omitting or sanitizing the actual misconduct."  Id. at 14. Thus, M-Edge contends that the witness seeks to present his "personal version of the facts."  Id. at 9.  The gravamen of M-Edge's contention is that the witness did not rely upon the actual facts of the case and did not consider all of the pertinent evidence that he should have.  This contention is, certainly, the basis for cross-examination but not for exclusion of the testimony.

In i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831 (Fed. Cir. 2010), Microsoft argued that i4i's expert did not use the proper data in calculating a reasonable royalty calculation. Id. at 854.  The Federal Circuit agreed that "i4i's expert could

have used other data in his calculations," but nevertheless upheld the lower court's decision to admit the expert's testimony.  Id. at 855-56.  In so doing, the Federal Circuit stated that "it is not the district court's role under Daubert to evaluate the correctness of facts underlying an expert's testimony."  Id.  Rather, "what facts are most relevant or reliable to calculating a reasonable royalty are for the jury," which is "entitled to hear the expert testimony and decide for itself what to accept or reject."  Id.

The Court reaches the same conclusion as the i4i court. The "mere weaknesses in the factual basis of an expert witness'[s] opinion bear on the weight of the evidence rather than on its admissibility."  Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC, No. CIV. WDQ-11-2478, 2012 WL 3115867, at *4 (D. Md. July 25, 2012) (quoting McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 801 (6th Cir. 2000)).  As in i4i, the reliability of the factual basis underlying Mr. Koenigsberg's testimony is appropriately challenged by cross-examination, not a motion in limine.  i4i, 598 F.3d at 856.  See also Daubert, 509 U.S. at 596; Westberry, 178 F.3d at 261.

4) <u>Improper Role</u>

M-Edge contends that Amazon is seeking to use Mr. Koenigsberg "to give Amazon's spin on the evidence through the mouth of a self-described 'consumer electronics industry expert,' in effect making a closing argument from the witness stand."  Koenigsberg MIL Mem. 2.  M-Edge fears that "Mr. Koenigsberg threatens to turn Amazon's attorney argument into evidence," thereby misleading the jury.  <u>Id.</u> at 17.

However, the Court does not find a realistic possibility of misleading the jury.  Certainly, the Court would consider a request for a cautionary instruction – <u>addressed to all expert witness testimony</u> – to the effect that such witnesses may be making assumptions about the facts that the adversary will contest, but that it will be the jury that finds the facts, not the expert witness.  Moreover, M-Edge will have the opportunity to cross-examine Mr. Koenigsberg and point out that his opinion is based upon erroneous assumptions of fact.

In sum, the Court shall not exclude testimony of Mr. Koenigsberg to the extent, if at all, it may be relevant.

2.   Dr. Allyn Strickland (Damages)

Amazon proffers the testimony of Dr. Allyn Strickland as a

damages expert.   M-Edge seeks exclusion of Dr. Strickland's

testimony to the extent that it includes:

1.   Testimony regarding Amazon's good corporate
     character.

2.   Improper opinion regarding Amazon's liability for
     unfair competition.

3.   Opinion testimony that M-Edge engaged in bad
     acts.

4.   Any alternative non-patent damages claim other
     than the one for $6,037.

Strickland MIL 1-2.

1) Character (Background) Testimony

Amazon seeks to offer Dr. Strickland's opinion that:

- Amazon . . . seeks to be Earth's most customer-
  centric company.

- Amazon announced in October 2013 that it would be
  opening a . . . fulfillment center in Baltimore
  [in an area previously closed for development]
  that will create more than 1,000 jobs.

- Amazon's founder and CEO, Mr. Bezos, was named
  Time Magazine's Person of the Year in 1999.   In
  2008, Mr. Bezos was named "America's Best Leader"
  by the U.S. News and World Report . . . .   In
  2011, Jeff Bezos and Gregg Zehr won the
  Economist's Innovative Award (for consumer
  products) for the Kindle.

Strickland MIL 3-4.

The Court finds a considerable degree of potential undue prejudice – and an effort to pander to a local jury - in Dr. Strickland's purported character or "background" evidence. While Amazon is entitled to present some proper background information,[14] the Court finds it necessary to exercise control over the evidence.  Accordingly, the Court will require Amazon, at least two days prior to offering any "background" testimony (and preferably prior to trial), to present a proffer of the evidence for an advance ruling regarding admissibility.

### 2) "Bad Acts" Testimony

M-Edge seeks to have the Court bar Dr. Strickland's opinions regarding "Amazon's liability for unfair competition" and "M-Edge's purported bad acts."  Strickland MIL 2.  For example, Dr. Strickland's opinions that:

- M-Edge made a conscious business decision not to participate in the MfK program and end its

---

[14] For example, testimony to prove that:

> When Amazon first began the business it was a place to buy books because of the unique customer experience the Web could offer book lovers.  Mr. Bezos felt that the internet was the convenience of browsing a selection of millions of book titles in a single sitting.  Through its technical innovation, Amazon grew to offer customers more types of products, more conveniently, and at even lower prices.

Strickland MIL 3-4.

relationship with Amazon in pursuit of large
retailers and other device covers.

- M-Edge concluded that they did not want to pay a
  fee for the use of the Kindle logo.

- Ms. McCloskey [M-Edge's damages expert] ignored
  the fact that M-Edge's online sales at Amazon.com
  declined in 2011 and became close to zero because
  of M-Edge's own actions.

- M-Edge made the conscious business decision not
  to participate in the MfK program.

Id. at 5-6.

M-Edge seeks Dr. Strickland's opinions regarding M-Edge's

bad acts. For example:

- M-Edge's deceptive acts toward Amazon.

- Amazon believed in mid-2011 that M-Edge had
  violated the NDA with Amazon when the two parties
  were negotiating the MfK program.

- Amazon also discovered violations of the July
  2010 Agreement by M-Edge and notified M-Edge of
  them in September 2011.

- M-Edge continues to sell a large number of Kindle
  accessories, without using the official Kindle
  logo.

Id. at 10.

Inasmuch as the only claim remaining to be tried is M-

Edge's patent infringement claim against the Shasta cover, such

opinions are inadmissible as irrelevant.

### 3) Alternative Damages Calculations

Dr. Strickland performed only one non-patent damages calculation – opining that there was a $6,037 loss relating to M-Edge's delay in launching its "Shasta" ereader cover.[15] Strickland MIL 12; Strickland Opp. 14 [Document 123]. Amazon contends that much of Dr. Strickland's testimony will go to the issue of causation in regard to the tort claims. See, e.g., Golden Nugget, Inc. v. Chesapeake Bay Fishing Co., L.C., 93 F. App'x 530 (4th Cir. 2004) (holding that an expert could testify about the cause of a fire).

Inasmuch as the Court is granting summary judgment to Amazon on all non-patent claims, the Court finds Dr. Strickland's non-patent damages opinions irrelevant.

V.    CONCLUSION

For the foregoing reasons:

    1.    Defendant Amazon.com, Inc.'s Motion for
          Summary Judgment [Document 126] is GRANTED
          IN PART AND DENIED IN PART.

        a.    Amazon is granted summary judgment on
              all claims other than the patent
              infringement claim against the Shasta
              cover in Count I.

    2.    Plaintiff's Motion in Limine to Bar
          Testimony of Amazon's "Consumer Electronics

_____

[15] This is the M-Edge equivalent of Amazon's Type I Device.

Industry Expert," Bruce Koenigsberg, and to
Strike His Report [Document 108] is DENIED.

3.   M-Edge's Motion in Limine to Bar Certain
Testimony of Amazon's Damage Expert, Allyn
Strickland, and to Strike the Corresponding
Portions of His Report [Document 117] is
GRANTED IN PART AND DENIED IN PART.

a.   Except as otherwise provided herein,
Dr. Strickland may not testify as to
Amazon's good corporate character,
Amazon's liability for unfair
competition, M-Edge's alleged bad acts
or non-patent damages claims.

b.   Amazon may offer "background" evidence
from any witness only to the extent it
obtains leave of Court to do so after
presenting a proffer of the evidence at
least two days prior to presenting it.

4.   M-Edge shall arrange a telephone conference
to be held by February 20, 2015, to discuss
the scheduling of further proceedings
herein.


SO ORDERED, on Thursday, January 29, 2015.


_____/s/_____ _____
Marvin J. Garbis
United States District Judge